IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| NEW ALBANY MAIN STREET PROPERTIES d/b/a PORT OF LOUISVILLE, | ) ) ) | CIVIL ACTION NO.: 3:20-cv-343-RGJ |
| PLAINTIFF, | ) ) | |
| v. | ) ) | |
| WATCO COMPANIES, LLC, | ) ) | |
| SERVE: Corporation Service Company 251 Little Falls Drive Wilmington, Delaware 19808 | ) ) ) ) ) | |
| and | ) ) | |
| MARIA BOUVETTE, | ) ) | *Electronically Filed* |
| SERVE: 367 Willow Wood Drive Mt. Washington, Kentucky 40047 | ) ) ) | |
| DEFENDANTS. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, New Albany Main Street Properties d/b/a Port of Louisville ("Port of Louisville"), by counsel, hereby files this Complaint against Defendants, Watco Companies, LLC ("Watco") and Maria Bouvette ("Bouvette").

## PARTIES

1. Port of Louisville is an Indiana limited liability company with a principal place of business located at 3282 Kepley Road, Georgetown, Indiana 47122. Port of Louisville is owned by three individuals: Gregory P. Cantrell, who is citizen of the State of Indiana; Joseph P. Tegart, who also is a citizen of the State of Indiana; and P. Ron Siler, who is a citizen of the State of Florida.

2. Watco is a Delaware limited liability company that is licensed to do business as a foreign entity in the Commonwealth of Kentucky. Watco's principal place of business is located at 315 West 3rd Street, Pittsburg, Kansas 66762. None of the members of Watco are citizens of Kentucky, Indiana, or Florida.

3. Bouvette is the Executive Director of Louisville/Jefferson County Riverport Authority ("Riverport Authority"). She is a citizen of the Commonwealth of Kentucky.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because Port of Louisville seeks monetary damages in excess of $75,000 and, as outlined above, Port of Louisville and Defendants are citizens of different states.

5. This Court is the proper venue for this dispute pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this Complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS

A. <u>Riverport Authority and Port of Louisville's Lease Agreements</u>.

6. The Riverport Authority is a Kentucky corporation, which was established pursuant to the Riverport Authority Act, KRS § 65.510, *et seq*.

7. Riverport Authority is a body politic that has certain statutory powers, including the ability to "contract with any person or governmental agency for the use of the riverport and riverport facilities." KRS § 65.610(1).

8. Pursuant to its statutory authority, Riverport Authority developed an industrial park and public port facility as part of a 300-acre Industrial Complex located between Miles 618 and 622 on the Ohio River ("Port Facility").

9. The Port Facility, which is principally comprised of an out-of-service coal terminal and an operating general cargo dock, provides facilities and equipment for loading and unloading goods and commodities; barge fleeting and loading and unloading; ground storage; and truck and rail transportation.

10. On September 1, 2009, after a public bidding process in which Port of Louisville was the only bidder, Port of Louisville and Riverport Authority executed a "Port Facility Lease" for Port of Louisville to lease the Port Facility.

11. The Port Facility Lease had an initial term of five years, with three additional five-year renewal terms.

12. The Port Facility Lease required the payment of a minimum rent plus additional rent based on the tonnage of cargo handled by the Port of Louisville.

13. Since entering the Port Facility Lease in 2009, Port of Louisville and its owners have invested substantial capital, time, and energy to restore the once neglected Port Facility and ensure its financial success. In fact, the three members of Port of Louisville have made personal capital investments from $1 to $1.5 Million into the Port Facility and continued to reinvest income generated by the Port Facility back into the property and equipment.

14. Despite this long-term financial and time commitment, because of market conditions, Port of Louisville was sometimes not able to generate the necessary tonnage volume to require the payment of additional rent. As a result, Port of Louisville has often only paid the minimum rent due under the Port Facility Lease.

15. Riverport Authority agreed to amend the Port Facility Lease in June 2012, replace it in July 2012, and amend it again in 2013 and 2014.

16. Additionally, the rent revenue structure was again adjusted in 2016. In connection with that adjustment, the Riverport Authority instituted a new public bid process by mutual consent of the Port of Louisville and Riverport Authority.

17. On August 19, 2016, after a public bidding process in which Port of Louisville was, again, the only bidder, Port of Louisville and Riverport Authority executed a "Modified Port Facility Lease" ("Modified Lease"). The original draft of the Modified Lease provided for a lease term of two weeks which could be renewed for three additional five-year terms and a final term of four years and five months, for a total possible term of around 19 years, five months, and two weeks.

18. The Modified Lease provided that Port of Louisville would pay a minimum annual rent of $200,000 plus additional rent based on the tonnage of cargo moved.

B. <u>Watco and Bouvette Conspire to Remove Port of Louisville from the Port Facility</u>.

19. For approximately ten years, Riverport Authority never complained to Port of Louisville about its performance under the Port Facility Lease or the Modified Lease.

20. In late 2018 and early 2019, however, Watco, a competitor of the Port of Louisville in the Louisville-area Ohio River pool located at the Clark Maritime Center (a specifically listed facility in the Article III (5) Non-Competition provision of the Modified Lease), began secret negotiations with Maria Bouvette of the Riverport Authority to remove Port of Louisville as operator of the Port Facility and replace it with Watco, despite the lease between Port of Louisville and the Riverport Authority.

21. On February 2, 2019, Watco entered into a Memorandum of Understanding with Riverport Authority to remove and replace Port of Louisville as the operator of the Port Facility.

22. Shortly after executing the Memorandum of Understanding, Watco began to develop suggestions for pretexts to justify removing Port of Louisville and communicated those ideas to Bouvette.

23. At Watco's recommendation, Riverport Authority hired consultant Krech Ojard to inspect the Port Facility to create a supposed basis to evict Port of Louisville. The consultant was paid by, and worked at the direction of, Watco.

24. Unsurprisingly, in an effort to unseat Port of Louisville, Mr. Ojard issued a report that set out numerous supposed deficiencies in Port of Louisville's operations. Many of those claimed deficiencies pertained to previous "coal yard" operations which had been out of service since before 2009 and which the Port of Louisville had no duty to put back into service.

25. Upon information and belief, at Watco's direction, Riverport Authority hired a safety inspector and a consultant to inspect Port of Louisville's equipment.

26. The inspector and consultant produced false findings that the Port Facility was mismanaged, unsafe, and in disrepair. These reports were then used by Riverport Authority and Watco as justification for asserting that Port of Louisville was in default of the Modified Lease.

27. Importantly, none of the reports from the inspectors or the consultants were shared with Port of Louisville until after the Riverport Authority filed several lawsuits against the Port of Louisville, which are discussed in detail below.

28. Throughout April and May 2019, Watco continued to engage in secret negotiations with Riverport Authority to replace Port of Louisville as the operator of the Port Facility. Watco and Riverport Authority exchanged numerous draft leases for the Port Facility. None of those public contracts were negotiated or prepared in accordance with Kentucky's public bidding statutes.

29. On May 15, 2019, Watco and Bouvette's plan to replace and remove Port of Louisville as operator of the Port Facility was put into action when Riverport Authority's attorney sent a letter to Port of Louisville alleging it was in default of the Modified Lease.

30. Port of Louisville responded to this letter by paying the rent Riverport Authority claimed was due and denying that it was in breach of the Modified Lease.

31. Nonetheless, on June 10, 2019, Riverport Authority filed a lawsuit against the Port of Louisville in the Jefferson Circuit Court seeking to recover damages and compel compliance with the Modified Lease. *See Louisville and Jefferson County Riverport Authority v. New Albany Main Street Properties*, *LLC*, 19-CI-003564 (Jefferson Cir. Court).

32. Then, just two days later, Riverport Authority filed a separate forcible detainer action in Jefferson District Court seeking to evict Port of Louisville. *See Louisville and Jefferson County Riverport Authority v. New Albany Main Street Properties, LLC*, 19-C-007126.

33. The abusive litigation tactics did not end there. On June 28, July 19, and August 2, 2019, Riverport Authority sent additional default notices to Port of Louisville. The August 2, 2019, notice purported to terminate the Modified Lease and ordered Port of Louisville to vacate the Port Facility.

34. Riverport Authority then filed a second forcible detainer action on August 6, 2019, in the Jefferson District Court. *See Louisville and Jefferson County Riverport Authority v. New Albany Main Street Properties, LLC*, 19-C-010189.

35. On August 8, 2019, Port of Louisville responded to Riverport Authority's August 2, 2019, default notice denying that it was in default of the Modified Lease.

36. A day later, on August 9, 2019, Riverport Authority issued a Request for Proposal soliciting bids for a new lease on the Port Facility. Riverport Authority asked other operators, including the Port of Louisiana, to place a bid and replace Port of Louisville.

37. In the end, Riverport Authority awarded the new lease to Watco subject to one condition: that Watco and Bouvette were effective at forcing the eviction of Port of Louisville from the Port Facility.

C. Arbitration Between Riverport Authority and Port of Louisville.

38. The two forcible detainer actions were eventually stayed, and the case styled *Louisville and Jefferson County Riverport Authority v. New Albany Main Street Properties, LLC*, 19-CI-003564, by virtue of an Agreed Order entered October 31, 2019, was sent to Arbitrator John Hays for resolution of two threshold questions: (1) was there an actionable breach of the Modified Lease by the Port of Louisville, and (2) was the Modified Lease a valid and enforceable agreement.

39. In the arbitration, Riverport Authority argued that the Modified Lease violated Kentucky's franchise law set forth in Section 164 of the Kentucky Constitution, and, even if enforceable, Port of Louisville breached the terms of the Modified Lease in twelve independent ways.

40. Arbitrator Hays disagreed, concluding that the Modified Lease was valid and enforceable under Kentucky law.

41. Further, Arbitrator Hays concluded that Port of Louisville committed no material violations of the Modified lease.

42. The arbitration is now proceeding on the Port of Louisville's counter-claims against the Riverport Authority. Watco and Bouvette are not parties to an arbitration agreement with Port of Louisville. By an Opinion and Order entered on September 20, 2019, in the case styled

*Louisville and Jefferson County Riverport Authority v. New Albany Main Street Properties, LLC*, 19-CI-003564, the Court has ruled that Port of Louisville's counterclaims for damages against Riverport Authority are not precluded by sovereign or governmental immunity.

D. <u>Watco and Bouvette's Interference with Port of Louisville's Business</u>.

43. As part of their efforts to remove Port of Louisville from the Port Facility, Watco and Bouvette tortiously interfered with a number of Port of Louisville's existing and prospective contracts and business relationships.

44. For instance, Watco and Bouvette interfered with Port of Louisville's contract and business relationship with ELG Metals, one of the Port of Louisville's most important customers. ELG Metals leases property adjacent to the Port Facility. ELG Metals uses the property as a scrapyard where it aggregates stainless steel to be loaded onto barges and shipped by the Port of Louisville.

45. ELG Metals and Port of Louisville are parties to a contract whereby Port of Louisville has agreed to load barges with stainless steel scrap for ELG Metals at the Port Facility and ship the steel to North American Stainless in Carrolton, Kentucky. In 2019, Port of Louisville was scheduled to load 25 to 35 barges of stainless steel for ELG at an agreed-upon rate of $10.84 per ton. Port of Louisville has regularly loaded barges for ELG Metals at this rate.

46. However, Watco and Bouvette engaged in a plan to renegotiate ELG Metals' lease with Riverport Authority and in doing so unilaterally lowered the rate for stainless steel loading from $10.84 per ton to $6.61 per ton in the contract between ELG and the Riverport Authority. This action is in direct breach of Article VII of the Modified Lease, which provides that Riverport may not bind the Port of Louisville. Bouvette administers this contract, and she is responsible for ensuring that Riverport Authority abides by its terms.

47. Port of Louisville also has a contract and business relationship with Rivergreen Water Recycling, LLC (and its successor in interest, Valicor Environmental Services, LLC) ("Rivergreen Water Recycling"). Rivergreen Water Recycling conducts waste oil recycling and subleases property at the Port Facility from Port of Louisville.

48. Since secret negotiations with Watco began, Bouvette has communicated with Rivergreen Water Recycling and advised it to cease conducting business with Port of Louisville because Port of Louisville had breached its lease terms and was being evicted from the Port Facility, inducing cessation of direct rent payments to Port of Louisville.

49. Bouvette had similar communications with Alabama Wire, another Port of Louisville customer. Bouvette represented to Alabama Wire that Port of Louisville violated its lease terms and was being evicted from the Port Facility so that Alabama Wire would move its business to Watco.

50. Upon information and belief, Watco and Bouvette also interfered with Port of Louisville's existing and/or prospective relationships with Nucor Tubular Products (a division of Nucor Corp.), Valicor, Inc., Ironton, LLC, Mid-Continent Coal & Coke Co., and other existing or prospective customers.

51. Bouvette took this action at the direction of, and with assistance by, Watco.

52. Further, in early 2019, Watco started contacting employees of Port of Louisville advising that Port of Louisville was being evicted and instructing those individuals that they would need to complete new employment paperwork with Watco if they wanted to keep their jobs at the Port Facility.

# LEGAL CLAIMS

## COUNT I
**(Tortious Interference with Contractual Relationship and Business Relations)**

53. Port of Louisville hereby incorporates the preceding paragraphs as if fully restated herein.

54. For many years, Port of Louisville enjoyed contracts and business relationships with Riverport Authority, ELG Metals, Rivergreen Water Recycling, and Alabama Wire.

55. Both Watco and Bouvette knew that Port of Louisville was engaged in contractual and business relationships with Riverport Authority, ELG Metals, Rivergreen Water Recycling, and Alabama Wire.

56. Watco and Bouvette intentionally and without justification interfered with these and other contractual and business relationships (*e.g.*, Nucor Tubular Products (a division of Nucor Corp.), Valicor, Inc., Ironton, LLC, Mid-Continent Coal & Coke Co., and other existing or prospective customers) by engaging in secret negotiations to replace and remove the Port of Louisville as the operator of the Port Facility, all while complaining in the arbitration that Port of Louisville was failing to develop new business.

57. Watco and Bouvette also intentionally and without justification interfered with Port of Louisville's business relationships with ELG Metals when as part of renegotiating its lease with ELG Metals, they wrongfully and unilaterally lowered the rate for stainless steels loading from $10.84 per ton to $6.61 per ton.

58. Watco and Bouvette also intentionally and without justification interfered with Port of Louisville's business relationships with Rivergreen Water Recycling and Alabama Wire when they advised those customers not to do business with Port of Louisville because Port of Louisville had violated its lease terms and was being evicted from the Port Facility.

59. Watco and Bouvette's actions also have interfered with Port of Louisville's ability to acquire other customers, to increase its revenue, and to develop its business in a profitable manner.

60. Watco and Bouvette's conduct was intended to cause or threatened to cause Riverport Authority, ELG Metals, Rivergreen Water Recycling, Alabama Wire, and other customers to breach their contracts with Port of Louisville or otherwise interfere with Port of Louisville's business relationships with those businesses and to prevent Port of Louisville from acquiring other customers.

61. Watco and Bouvette also interfered with the Port of Louisville's relationships with its employees.

62. As a direct and proximate result of Watco and Bouvette's conduct, Port of Louisville has suffered and will continue to suffer harm, and thus is entitled to compensatory damages.

63. Watco and Bouvette's conduct also was oppressive, fraudulent, and malicious so as to warrant an award of punitive damages.

## COUNT II
### (Civil Conspiracy)

64. Port of Louisville hereby incorporates the preceding paragraphs as if fully restated herein.

65. From at least January 2019 to September 2019, Watco and Bouvette intentionally and voluntarily joined together in concert with each other and Riverport Authority to develop and act upon an unlawful conspiratorial plan whereby they would remove Port of Louisville as the operator of the Port Facility, replace Port of Louisville with Watco and transfer Port of Louisville's customer contracts and business relationships to Watco.

66. As part of this conspiracy, Watco and Bouvette (1) engaged in secret negotiations to replace Port of Louisville as operator of the Port Facility, (2) executed a Memorandum of Understanding agreeing to find a way to remove and replace Port of Louisville as the operator of the Port Facility, (3) hired and paid for numerous consultants and inspectors to develop a supposed basis to evict Port of Louisville, (4) refused to provide Port of Louisville with the consultant and inspector reports in order to deny it the opportunity to cure any issues identified, (5) interfered with Port of Louisville's contractual and business relationships with ELG Metals, Rivergreen Water Recycling, Alabama Wire, and other existing and prospective customers in an attempt to harm the business relations, reputation, and good will of Port of Louisville, and (6) initiated a public bidding process for lease of the Port Facility as a ruse to "legitimately" select Watco as Port of Louisville's replacement despite the fact that Port of Louisville had not yet been found in default or breach of the Modified Lease or legally evicted from the property.

67. Port of Louisville has suffered harm and will continue to suffer harm as a direct and proximate result of the above conspiracy, and thus is entitled to compensatory damages.

68. Watco and Bouvette's conduct also was oppressive, fraudulent, and malicious so as to warrant an award of punitive damages.

## COUNT III
**(Defamation)**

69. Port of Louisville hereby incorporates the preceding paragraphs as if fully restated herein.

70. Watco and Bouvette published and/or caused to be published false and defamatory statements regarding Port of Louisville's business and its purported violation of the terms of the Modified Lease.

71. As outlined above, Watco and Bouvette told Port of Louisville's existing and prospective customers, including Rivergreen Water Recycling and Alabama Wire, and Port of Louisville's employees, that Port of Louisville had violated its lease terms and was being evicted from the Port Facility, in an effort to induce those employees, customers, and business relationships to switch to Watco.

72. Watco and Bouvette knew or should have known that these statements were false, and they acted with negligent disregard of the truth or falsity of the statements.

73. Watco and Bouvette made the defamatory statements willfully, wantonly, and maliciously and/or with reckless disregard for the truth.

74. The defamatory statements have caused and will continue to cause Port of Louisville damages in the form of lost and/or decreased business opportunities and harm to reputation, thus Port of Louisville is entitled to compensatory damages.

75. Watco and Bouvette's conduct also was oppressive, fraudulent, and malicious so as to warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, New Albany Main Street Properties d/b/a Port of Louisville, respectfully requests the following relief:

1. Judgment in its favor against Watco and Maria Bouvette for compensatory and punitive damages in an amount to be determined at trial;

2. A temporary and permanent injunction enjoining Watco and Maria Bouvette from taking any further action to interfere with Port of Louisville's contracts and business relationships;

3. Pre-judgment and post-judgment interest in an amount equal to the maximum allowable under the law;

4. An award of reasonable attorneys' fees and costs;

5. A trial by jury on all such triable issues; and

6. Any and all other relief to which Port of Louisville may be entitled.

        Respectfully submitted,


        /s/ Kent Wicker
        Kent Wicker (82926)
        Erin M. Shaughnessy (98594)
        Dressman Benzinger LaVelle psc
        2100 Waterfront Plaza
        321 West Main Street
        Louisville, Kentucky 40202
        Phone: (502) 572-2500
        Email: kwicker@dbllaw.com
                eshaughnessy@dbllaw.com

and

        Kevin F. Hoskins (91027)
        Dressman Benzinger LaVelle psc
        221 East Fourth Street, Suite 2500
        Cincinnati, Ohio 45202
        Phone: (513) 241-4110
        Email: khoskins@dbllaw.com
        *Counsel for New Albany Main Street Properties, LLC d/b/a Port of Louisville*